IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| THOMAS MUNROE III and KAREN MUNROE, Individually and as Heirs to The Estate of RICHARD ALEXANDER MUNROE,<br>　　　　　*Plaintiffs,*<br>V.<br><br>THE CITY OF AUSTIN, ART ACEVEDO, Individually and as CHIEF OF THE AUSTIN POLICE DEPARTMENT; OFFICER JOHN NELSON, Employee #7861, Individually; OFFICER MATTHEW MURPHY, Employee #7617, Individually; OFFICER STEPHEN JOHNSON, Employee #7804, Individually,<br>　　　　　*Defendants.* | § § § § § § § § § § § § § § § § § § §<br><br>**CIVIL ACTION NO.**<br>1:16-cv-1166 |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

Now comes **THOMAS MUNROE** and **KAREN MUNROE**, hereinafter referred to as Plaintiffs, by and through their undersigned attorney of record, in accordance with the Civil Rights Act, the Federal Rules of Civil Procedure, the Texas Tort Claims Act, and Title II of the Americans with Disabilities Act, file this, their Original Complaint, against the **CITY OF AUSTIN**; **ART ACEVEDO,** Individually and as **CHIEF OF THE AUSTIN POLICE DEPARTMENT; OFFICER JOHN NELSON**, Employee #7861, Individually; **OFFICER MATTHEW MURPHY**, Employee #7617, Individually; **OFFICER STEPHEN JOHNSON,** Employee #7804, Individually; hereinafter referred

to as Defendants.

In support of this cause of action, Plaintiffs would respectfully show unto the Court the following:

# I.
# PARTIES

1. Plaintiff **THOMAS MUNROE** is an individual residing in Bexar County, Texas, and is the biological father of **RICHARD "BRICK" ALEXANDER MUNROE**, deceased, hereinafter referred to as **"BRICK"**.  He sues in his individual capacity and as heir to the estate of **BRICK**.  Plaintiff **KAREN MUNROE** is an individual residing in Bexar County, Texas, and is the biological mother of **RICHARD "BRICK" ALEXANDER MUNROE**, deceased.  She sues in her individual capacity and as heir to the estate of **BRICK**.

2. Defendant **CITY OF AUSTIN** is a municipal governmental entity within the State of Texas and the public employer of **ART ACEVEDO, CHIEF OF THE AUSTIN POLICE DEPARTMENT, OFFICER JOHN NELSON**, **OFFICER MATTHEW MURPHY**, and **OFFICER STEPHEN JOHNSON**.  The City of Austin may be served with process by serving the Mayor of the City of Austin, Steve Adler; the City Manager of the City of Austin, Marc Ott; the City Attorney of the City of Austin, Anne Morgan; or the City Clerk of the City of Austin, Jannette Goodall, at 301 W. Second Street, Austin, Texas 78701, or anywhere they may be found.

Defendant **ART ACEVEDO,** Individually and as **CHIEF OF THE AUSTIN POLICE DEPARTMENT** (hereinafter referred to as **"DEFENDANT CHIEF**

**ACEVEDO"**), at all times relevant, was a resident of the State of Texas, and was an employee for the Austin Police Department. He can be served with process at the Austin Police Department, 715 E. Eighth Street, Austin, Texas 78701, or anywhere he may be found.

3.      Defendant **OFFICER JOHN NELSON**, Employee #7861, Individually (hereinafter referred to as **"DEFENDANT NELSON"**), is an individual and, at the time of the incident, was a duly appointed and acting officer of the Police Department of the **CITY OF AUSTIN**, acting under the color of law, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the **CITY OF AUSTIN**. He can be served with process at the Austin Police Department, 715 E. Eighth Street, Austin, Texas 78701, or anywhere he may be found.

4.      Defendant **OFFICER MATTHEW MURPHY**, Employee #7617, Individually (hereinafter referred to as "**DEFENDANT MURPHY"**), is an individual and, at the time of the incident, was a duly appointed and acting officer of the Police Department of the **CITY OF AUSTIN**, acting under the color of law, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the **CITY OF AUSTIN**. He can be served with process at the Austin Police Department, 715 E. Eighth Street, Austin, Texas 78701, or anywhere he may be found.

5.      Defendant **OFFICER STEPHEN JOHNSON**, Employee #7804, Individually (hereinafter referred to as **"DEFENDANT JOHNSON"**), is an individual and, at the time of the incident, was a duly appointed and acting officer of the Police Department of the **CITY OF AUSTIN**, acting under the color of law, under the color of the statutes, ordinances, regulations, policies, customs, and usages of the **CITY OF AUSTIN**. He can be served with process at the Austin Police Department, 715 E. Eighth Street, Austin,

Texas 78701, or anywhere he may be found.

## II.
## VENUE AND JURISDICTION

6. Plaintiffs assert their claims against Defendants for violation of **BRICK**'s Fourth Amendment Rights against unreasonable search and seizure, which is incorporated upon the States through the Fourteenth Amendment. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(3) (civil rights). This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear the state law claims that are set forth below.

7. Because Defendants' actions, inactions, and failures to comply with the Civil Rights Act all occurred or failed to occur in Travis County, Austin, Texas, venue in the Austin Division of the Western District of Texas under 28 U.S.C. § 1391(b) is appropriate.

## III.
## STATEMENT OF FACTS

8. Early in the morning of July 5, 2015, **BRICK MUNROE** called 911 distraught and crying. He told the operator the only thing he needed was someone to talk to. Twenty-four minutes later, he was shot six times by Austin police officers, while still on the phone with 911. The call recorded the final labored breaths **BRICK** took before he died on his front porch.

9. **BRICK** suffered from Schizoid Personality Disorder, but he was also a gentle soul, and a loving son, brother, uncle, and friend. He was musically talented, and an Eagle Scout who was sensitive to others' pain. **BRICK** knew he needed help, and during his short

life, he saw several physicians and psychologists in his struggle to overcome his mental illness.  He was hospitalized in two different mental health care facilities in an effort to receive the treatment he needed, and he was prescribed medications, which helped stabilize his symptoms and improve his outlook.

10. In spite of his mental illness, **BRICK** was an educated and fully-functioning twenty-five-year-old who lived with three other people in a house in Austin.  During his five years in Austin, he worked at several restaurants before taking a job in 2014 at the family rug business, where he was never late and never missed work.  He enjoyed playing video games with others, and would go to the movies or out to eat with his housemates.  His housemates were aware of his struggles with mental illness and knew he took prescription medications to help him.

11. In 2014, **BRICK** left his three month stay at the Menninger Clinic in Houston, Texas with specific tailored medications. **BRICK'**s local doctor in Austin, Texas disagreed with the Menninger Clinic doctor's prescribed medications and advised **BRICK** to change his prescriptions.

12. On July 4, 2015, **BRICK** spent the day at home.  Around 10:00 p.m., **BRICK** lent his car to his roommate, Nick, so Nick could go to work.  The owners of the home, who also lived in the house with **BRICK**, had gone out of town.  Before they left that day, none of the three roommates saw any signs from **BRICK** that concerned them.

13. How **BRICK** spent the rest of the evening is unclear, but around 3:30 a.m. on

July 5th, he attempted to call and text several friends and family members. After speaking with his roommate, Brianna, he dialed 911 for help. He was clearly distraught, and tearfully told the operator he "just wanted to talk to somebody." The operator recognized that **BRICK** was upset and tried to find out what was going on. Through periods of sobbing, **BRICK** had an otherwise friendly conversation with the operator. He asked her name and they discussed life and work. During the twenty-six-minute exchange, **BRICK** repeatedly stated that all he needed was someone to talk to, and he thanked the operator eleven times for simply staying on the phone with him. He never threatened to harm himself or anyone else.

14. **BRICK** did not provide his address to the 911 operator, and throughout the call, he was adamant that he did not want the police sent to his home. The operator assured **BRICK** several times that there was no way for police to know his exact location. At one point, **BRICK** heard sirens outside, which made him nervous and agitated. But the operator explained that police are required to investigate within a 3-mile radius of the phone tower where the call had originated, and that was probably why he was hearing the sirens. The operator offered to send an MHO officer from a crisis unit that could "sit and chat" with **BRICK**. He did not accept, explaining that he had tried to get help before and had even been in a mental hospital previously.

15. Twenty-three minutes into the 911 call, **BRICK** realized that police officers were outside his home and he walked outside (the officers were later identified as **DEFENDANT OFFICER JOHN NELSON**, **DEFENDANT OFFICER MICHAEL MURPHY**, and **DEFENDANT OFFICER STEPHEN JOHNSON**). The officers

immediately began yelling at **BRICK**, who became upset that they had found where he lived.  The operator was unaware that officers had even arrived on scene, but after checking her computer, she communicated to the officers that they needed to "slow it down."  The officers did not slow down or back off.  Instead, they continued to yell at **BRICK**, commanding him to "show [his] hands!" and "put the gun down!".  Hearing these commands, the 911 operator asked **BRICK** if he had a gun.  Although he did not convey it to the operator, the gun he had was merely a BB gun.  **BRICK** never verbally threatened to harm the officers or himself.  The operator continued to talk to **BRICK**, calmly urging him to put the gun down and speak with the officers.  **BRICK** sat down on his front porch step, put the gun in his lap, and continued to talk to the 911 operator.  **DEFENDANT MURPHY** continued to yell at **BRICK**.  **BRICK** requested that **DEFENDANT MURPHY** stop talking.  When **DEFENDANT MURPHY** did not stop, **BRICK** made the request again, and even asked the operator to tell **MURPHY** to stop talking so he could have quiet for a second.  Instead of de-escalating the situation, **DEFENDANT MURPHY** rushed **BRICK** and attempted to tase him while he was on the phone.  The moment the taser was deployed, **DEFENDANT JOHNSON** and **DEFENDANT NELSON** knowingly and intentionally shot **BRICK** multiple times with the intent to kill.  **BRICK** died on his front porch, less than four minutes after stepping outside.  He was still on the phone with the 911 operator.

16.   The tragedy of this case is that it was entirely preventable.  **BRICK** was a twenty-five-year-old young man who was mentally ill and called 911 because he needed

someone to talk to.  He did not threaten to take his own life, as multiple statements from the Austin Police Department incorrectly report, nor did he threaten to harm anyone else. The 911 operator knew **BRICK** had sought help and that he had been hospitalized for his mental illness.  She conveyed these details to the officers responding to the call.  Armed with this information, it is incomprehensible why police officers, supposedly trained in crisis intervention by the Austin Police Department, would address the situation the way Officers **NELSON**, **MURPHY**, and **JOHNSON** did on July 5, 2015. Instead of attempting any sort of effective de-escalation, or communicating with the 911 operator who had been talking to **BRICK** for over twenty minutes, officers continuously confronted **BRICK** from the moment he stepped outside his home, and within four minutes attempted to tase him, which led to his shooting and death.

  17. **BRICK** repeatedly expressed that he did not want officers at his home.  He merely wanted someone to talk to.  Prior to police arriving, **BRICK** had spent twenty-three minutes conversing with the 911 operator without incident or threat.  Yet within four minutes of interacting with **DEFENDANTS NELSON**, **MURPHY**, and **JOHNSON**, he was dead. It is readily apparent that **DEFENDANTS NELSON**, **MURPHY**, and **JOHNSON** had absolutely no idea how to deal with a mentally ill citizen like **BRICK**. Had they handled the situation differently, **BRICK** would still be alive today.

  18. Texas Occupation Code section 17.01.253(j) mandates that Peace Officers have crisis intervention training ("CIT") within two years of joining a police department.

CIT programs train officers on how to deal with the mentally ill, which is different than that of the general public. Such training explains that only one officer should speak with the mentally ill person, that the officer should speak softly, and that the officer should keep a distance from the mentally ill person. It is clear that the CIT **DEFENDANTS NELSON**, **MURPHY**, and **JOHNSON** received, if any, was woefully inadequate in preparing them to deal with the situation that occurred on July 5, 2015. **DEFENDANT MURPHY** had been employed by the Austin Police Department for just fifteen months. He and the other officers knew before they arrived on scene that **BRICK** suffered from mental illness and that he might be in crisis. They knew **BRICK** did not want police assistance, and that he became agitated when he thought police might be at his home, yet they confronted him anyway. They knew that **BRICK** had been on the phone with the 911 operator for an extended period of time, and that he was still receiving 911 assistance when they arrived. Yet knowing these facts, **DEFENDANTS NELSON**, **MURPHY**, and **JOHNSON** took none of the precautions that CIT instructs. **DEFENDANT MURPHY** was the senior officer who took charge at the scene, yet it is apparent that instead of using any sort of realistic de-escalation or crisis intervention techniques, he immediately confronted **BRICK,** and only three minutes later, rushed **BRICK,** compressing time and distance.

19. **DEFENDANT JOHNSON** had been with the Austin Police Department only seven months at the time of the incident. He, too, failed to utilize, or even suggest, any crisis intervention techniques after arriving at the scene. **DEFENDANT JOHNSON**

asserted in his statement that after **DEFENDANT MURPHY** attempted to tase **BRICK**, **BRICK** jumped, went after his gun, and started to raise it toward **DEFENDANT MURPHY**. However, police audio and video of the event tell a much different story. There was no chance for **BRICK** to jump or reach for his gun or point it at **DEFENDANT MURPHY**. **DEFENDANT JOHNSON** began firing his weapon as the taser was deployed.

20. Further, **DEFENDANT JOHNSON'S** inexperience and immaturity is seen in his decision to mix date night with his duty to serve as a peace officer. **DEFENDANT JOHNSON'S** girlfriend rode along in his patrol car the night of the shooting. This was not the first time. These outrageous actions are in clear violation of APD policy, and constitute undertrained and irresponsible behavior.

21. **DEFENDANT NELSON** had been with the Austin Police Department less than four months when this tragic event occurred. Even if he had CIT, it is unlikely that in this short time he had much experience handling a crisis situation with a mentally ill individual. He also failed to utilize any of the techniques CIT is supposed to teach officers in responding to these types of situations. Like **DEFENDANT JOHNSON**, **DEFENDANT NELSON** immediately began firing when **DEFENDANT MURPHY** deployed his taser.

22. Crisis Intervention Training is mandated by the State of Texas. The basic premise of crisis intervention training is a de-escalation of a volatile situation. Police

officers frequently encounter mentally ill individuals.  CIT includes basic techniques which instruct the officers how to deal with someone who is suffering from a mental illness like **BRICK** was.  It is clear that the Austin Police Department has no real training regarding crisis intervention techniques, and places no importance on handling crisis situations with mentally ill individuals differently.  None of the officers involved in **BRICK**'s shooting and death attempted to take things slowly, de-escalate the situation, or wait for the appropriate MHO or crisis officers to arrive.

23.    The force used by **DEFENDANTS NELSON, MURPHY, AND JOHNSON** was clearly and obviously excessive. **BRICK MUNROE** never threatened any of the officers and never pointed a gun in their direction. At the time **BRICK** was shot and killed, he was sitting on the front porch stoop of his house. The BB gun he had was not in his hand but either in his lap or on the ground next to him. This is confirmed by the officers themselves. **DEFENDANT MURPHY** compressed time and distance by rushing **BRICK** and discharging his taser. He did not communicate his intentions to his fellow police officers, who after hearing the taser being deployed, fired repeatedly at **BRICK**, striking him six (6) times.

24.    **DEFENDANT JOHNSON AND DEFENDANT NELSON** shot and killed **BRICK** even though he made no threats, and never pointed a weapon in their direction. At no time did **BRICK** ever put any of these officers in a situation where they could fear for their lives.  At all times relevant, the **DEFENDANTS** had **BRICK** in plain view. They

saw that the gun was <u>not</u> in his hand. Their suggestion that he made some sort of move towards it is a complete and utter fabrication, as is proven by the video. **BRICK** was shot and killed <u>less</u> than one (1) second after the taser was deployed. It was physically impossible for him to reach for the BB gun, much less put the officers in fear for their lives.

25.   This horrible, terrible tragedy was 100% preventable. A young man called 911 because he just needed someone to talk to. He was receiving that help until police officers arrived at his home and unnecessarily escalated the situation within a few moments, ultimately killing him.

## IV.
## PLAINTIFFS' CIVIL RIGHTS CLAIM

26.   The Civil Rights Acts, as codified at 42 U.S.C. § 1983, provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any laws, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

### (A)   PLAINTIFFS' FIRST CLAIM:
### EXCESSIVE FORCE - PEACE OFFICER LIABILITY

27.   Plaintiffs restate, re-allege, re-aver, and hereby incorporate by reference any and all allegations contained in the above paragraphs as if fully set forth herein.

28.   Plaintiffs bring a claim against **DEFENDANT NELSON**, **DEFENDANT MURPHY**, and **DEFENDANT JOHNSON** individually, pursuant to 42 U.S.C. § 1983.

29. The force used by **DEFENDANT NELSON** was excessive, and therefore violates the Fourth Amendment of the United States Constitution, which prohibits unreasonable searches and seizures.

30. The force used by **DEFENDANT MURPHY** was excessive, and therefore violates the Fourth Amendment of the United States Constitution, which prohibits unreasonable searches and seizures.

31. The force used by **DEFENDANT JOHNSON** was excessive, and therefore violates the Fourth Amendment of the United States Constitution, which prohibits unreasonable searches and seizures.

32. At all times relevant, **DEFENDANT NELSON** had actual awareness that **BRICK** had constitutional protection against unreasonable search and seizure. Despite having actual awareness of these protections, **DEFENDANT NELSON** violated the constitutional rights of **BRICK** and caused his wrongful death.

33. At all times relevant, **DEFENDANT MURPHY** had actual awareness that **BRICK** had constitutional protection against unreasonable search and seizure. Despite having actual awareness of these protections, **DEFENDANT MURPHY** violated the constitutional rights of **BRICK** and caused his wrongful death.

34. At all times relevant, **DEFENDANT JOHNSON** had actual awareness that **BRICK** had constitutional protection against unreasonable search and seizure. Despite having actual awareness of these protections, **DEFENDANT JOHNSON** violated the constitutional rights of **BRICK** and caused his wrongful death.

35. The actions of the three **DEFENDANTS** clearly demonstrate a complete and

total failure to train by **DEFENDANT CHIEF ACEVEDO**. As Chief Law Enforcement Officer, **DEFENDANT CHIEF ACEVEDO** had a duty to ensure that officers in the Austin Police Department were adequately trained in dealing with citizens with mental health issues. However, regardless of **BRICK's** mental condition, the actions taken by the Austin Police Department demonstrate a complete disregard for **BRICK's** Fourth Amendment Rights.

### (B) PLAINTIFFS' SECOND CLAIM: INADEQUATE TRAINING - CITY OF AUSTIN LIABILITY

36. The **DEFENDANT CITY OF AUSTIN** and the Austin Police Department are liable under 42 U.S.C. § 1983 for failing to train their law enforcement officers. Moreover, the City of Austin had the following policies and/or practices in effect prior to the shooting:

   a. Inadequate supervision of officers regarding their use of force;

   b. Employing excessive force against minorities and/or mentally ill;

   c. Employing deadly force disproportionately against minorities and/or mentally ill;

   d. Inadequate warning systems to discipline and/or weed out potentially dangerous officers;

   e. Failing to adequately investigate use of force by APD officers; and

   f. Inadequate training.

37. The City of Austin's policies/practices were the moving force of **BRICK'**s death and caused **BRICK** to be deprived of his constitutional rights to be free from unlawful seizures.

## V.
## SUPERVISORY LIABILITY - DEFENDANT, ART ACEVEDO, CHIEF OF THE AUSTIN POLICE DEPARTMENT

38. As Chief Law Enforcement Officer and the individual in charge of policy decisions for the Austin Police Department, **DEFENDANT CHIEF ACEVEDO** had the duty to ensure officers like **DEFENDANT NELSON**, **DEFENDANT MURPHY**, and **DEFENDANT JOHNSON** received proper crisis intervention training.  CIT training gives officers a basic understanding of mental health issues and appropriate de-escalation and communication tactics.  CIT training is completely different than typical police training.  For instance, situations involving mentally ill persons require a greater degree of patience and can require use of CIT tactics for extended periods of time.  Properly trained CIT officers understand they cannot let the pressure of time be a factor in their decision making.  The training also instructs that when handling situations where an individual has a mental illness, officers should not shout instructions at the individual.

39. On his call with 911, **BRICK** gave no indication that he had the intention to harm himself or anyone else.  He was alone in his home and getting the help he needed – someone to talk to.  It was irresponsible for officers ill-equipped to deal with a mentally ill individual to arrive at **BRICK**'s home and immediately escalate the situation.

40. **DEFENDANT ACEVEDO**, as a Chief Law Enforcement Officer, has policymaking authority for the Austin Police Department.  He possesses final authority to establish municipal policy with respect to the training of all Austin Police Department officers.  The clearly deficient training of officers with regard to citizens who suffer from mental illness rises to the level of deliberate indifference to constitutional rights of

individuals such as **BRICK MUNROE**.

## IX.
## TITLE II, AMERICANS WITH DISABILITIES ACT

41.     Title II of the Americans with Disabilities Act (hereinafter ADA) provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.  A public entity includes any department, agency, special purpose district, or other instrumentality of a State, or States or Local Government.  The language of Title II of the ADA tracks the language of section 504 of the Rehabilitation Act of 1973.  It was Congress's intent that Title II extend the protection of the Rehabilitation Act to cover all programs of State or Local Governments regardless of the receipt of federal financial assistance in that it would work in the same manner as section 504.  The statute specifically provides that remedies, procedures and rights available under section 504 shall be the same as those available under Title II. Section 504 provides that no otherwise qualified individual with a disability shall, solely by reason of his or her disability, be excluded from the participation and, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal or financial assistance.  A program or activity includes all of the operations of a department, agency, special purpose district, or other instrumentality of a state, or of a local government.  A disabled plaintiff can succeed in an action under Title II if he can show that, by reason of his disability, he was either excluded from participation in, or denied the

benefits of, the services, programs, or activities of a public entity, or otherwise subjected to discrimination by such entity. The Americans with Disabilities Act protects those with mental illnesses and requires reasonable accommodation of individuals like **BRICK** who suffer from mental illness.

42. Various courts have ruled that the encounter between the disabled individual and the police officer determines whether Title II will apply. There is consensus that when the situation is emergent and the officers have to make a split-second decision, the application of Title II of the ADA is disallowed. However, once an area is secure, and there is not a threat to human safety, police officers are under a duty to reasonably accommodate the individual's disability in handling that person.

43. As is clearly evident from the video and audio tapes of July 5, 2015, **BRICK** called 911 for assistance. Even though he spoke with the 911 operator for over twenty-five minutes, the entire encounter between him and law enforcement officers took place over less than a four-minute period. The 911 audio tape clearly demonstrates that **BRICK** was not a threat to anyone. When officers arrived, he sat down on his porch step. The officers knew that **BRICK** suffered from mental illness, and they were afforded every opportunity to de-escalate the situation. Either through gross malfeasance or deliberate indifference to the rights of **BRICK,** they allowed the situation to deteriorate, ultimately costing this young man his life.

## X.
## SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION

44. In addition to violating the rights guaranteed to **BRICK** by the First, Fourth

and Fourteenth Amendments to the United States Constitution, the **DEFENDANTS**, acting under color of law, violated the rights guaranteed to **BRICK** by the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution.

## XI.
## DAMAGES

45.     The actions and omissions of Defendants deprived **BRICK** of his civil rights under the United States Constitution. Moreover, these acts and omissions by Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiffs and proximately caused and/or were the moving force of the wrongful death of **BRICK.**  Accordingly, Plaintiffs assert claims under 42 U.S.C. § 1983 and the Texas Wrongful Death and Survivorship Statutes.

46.     Plaintiffs seek damages in excess of $75,000.00 for the violation of **RICHARD "BRICK" ALEXANDER MUNROE**'s Fourth Amendment constitutional right to be free from unreasonable search and seizure.

47.     Plaintiffs seek a declaratory judgment that the actions of **DEFENDANTS** here violated **RICHARD "BRICK" ALEXANDER MUNROE**'s Fourteenth Amendment constitutional rights to Due Process and Equal Protection of the law.  Plaintiffs also ask this Court to adopt the standard for reviewing ADA accommodation claims applied by the Ninth Circuit in *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1231-33 (9th Cir. 2014), *rev'd* 135 S.Ct. 1765 (May 18, 2015).

## XII.
## ATTORNEY'S FEES

48.     Plaintiffs are entitled to recover attorney's fees and costs as required by the

Civil Rights Attorney's Fees Award Act of 1976. *See* 42 U.S.C. § 1988. Plaintiffs hereby request that the Court and jury award him attorney's fees and expenses.

## XIII.
## JURY DEMAND

49. Plaintiffs respectfully demand a jury trial pursuant to Federal Rule of Civil Procedure 38(b).

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that Defendants, **THE CITY OF AUSTIN, ART ACEVEDO, Individually and as CHIEF OF THE AUSTIN POLICE DEPARTMENT, OFFICER JOHN NELSON, Individually, OFFICER MICHAEL MURPHY, Individually,** and **OFFICER STEPHEN JOHNSON, Individually,** be found liable, jointly and severally, for actual damages above the jurisdictional minimum of the Court, exemplary damages, pre-judgment interest, post-judgment interest, costs of Court, attorney fees and expenses and all other relief to which Plaintiffs are justly entitled, at law or in equity.

Respectfully submitted,

*/s/ Tim Maloney* _____
**TIM MALONEY**
State Bar No. 12887380
**LAW OFFICES OF MALONEY & CAMPOLO**
926 S. Alamo
San Antonio, Texas  78205
(210) 922-2200 – Telephone
(210) 923-1313 – Facsimile

tmaloney@maloneyandcampolo.com
mlopez@maloneyandcampolo.com

ATTORNEYS FOR PLAINTIFFS
THOMAS and KAREN MUNROE,
Individually and as Heirs of the Estate of
Richard "Brick" Alexander Munroe