IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| THOMAS MUNROE III and KAREN MUNROE, individually and as heirs to the estate of RICHARD ALEXANDER MUNROE, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § | 1:16-CV-1166-RP |
| THE CITY OF AUSTIN, ART ACEVEDO, individually and as chief of the AUSTIN POLICE DEPARTMENT, OFFICER JOHN NELSON, OFFICER MATTHEW MURPHY, and OFFICER STEPHEN JOHNSON, | § § § § § § § | |
| Defendants. | § § | |

## **ORDER**

Before the Court are Motions for Summary Judgment by Defendants John Nelson, Matthew Murphy, and Stephen Johnson, (Dkt. 23), and the City of Austin and Art Acevedo, (Dkt. 25). After reviewing the briefs, the record, and the relevant law, the Court issues the following order.

### **I. BACKGROUND**

This lawsuit, brought by Thomas Munroe III and Karen Munroe ("the Munroes"), concerns the death of their son, Richard "Brick" Alexander Munroe, in the early hours of July 5, 2015. Munroe called 911 shortly before 4:00 a.m. that morning. He told the 911 call taker that he wanted someone to talk to. The 911 call taker informed him, when asked, that she would not send police officers, but that as a routine response officers would drive around the three-mile radius of his location, which they could determine based on the information his cell phone transmitted to cell phone towers. However, the officers who self-assigned to the call—Matthew Murphy, Stephen Johnson, and John Nelson—were able to pinpoint Munroe's address with the help of the dispatcher

1

by searching for Munroe's cell phone number in a database and finding a record associated with it. When they arrived, as they were beginning to secure the perimeter of the house, Johnson saw through a window of the house that Munroe appeared to be holding a handgun.[1] Munroe came out of the house briefly, went back inside, and then came out once more. The second time, as he was standing on the front step of the house, Murphy attempted to calm Munroe down and told him to put the gun down. Munroe sat down on the step, put the gun in his lap, and removed his right hand from the gun. His left hand was holding his cell phone to his ear—he was still speaking to the 911 call taker. While Munroe's gun was in his lap, Murphy came out from behind the tree where he had been taking cover, approached Munroe, and fired his taser. Little more than one second after Munroe deployed his taser, gunshots rang out. The parties dispute what happened leading up to the gunshots.[2]

The officers contend that the taser was ineffective, and that Murphy, Johnson, and Nelson only began firing at Munroe after Munroe had pointed his gun at Murphy. The Munroes assert that it is possible that the taser was in fact effective, causing Richard Munroe to fall over, and that there is physical evidence from the autopsy suggesting that he was tased in the back (not in the front, as Murphy testified). They say—based on interviews conducted after the incident with Nelson and with Kelli Barge, a civilian rider who witnessed the incident from Johnson's car—that Murphy shot Munroe as he was falling over to his left, away from Murphy, and that he was therefore not reaching

---

[1] The gun was a BB gun that looked like a regular handgun. A side-by-side comparison of the gun Munroe held and a standard Austin Police Department .40 caliber service weapon, (Photo, Dkt. 23-5, at 10), reveals that it would be reasonable for an officer to believe it was a normal handgun. No reasonable jury could conclude otherwise. The Munroes do not contend that the officers should have known it was a BB gun.

[2] Johnson's dashboard camera captured the scene from a distance. A "plaintiff's version of the facts should not be accepted for purposes of qualified immunity when it is 'blatantly contradicted' and 'utterly discredited' by video recordings." *Curran v. Aleshire*, 800 F.3d 656, 664 (5th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)). Here, video from Johnson's dashboard camera portrays a grainy outline of the events, but it is not clear enough to blatantly contradict either side's version.

his gun up in Murphy's direction. Less than two seconds after Murphy used his taser, gunshots were fired. The three officers fired a total of 23 rounds, six of which hit Munroe.

The Munroes bring this action pursuant to 42 U.S.C. § 1983 ("Section 1983") and the Americans with Disabilities Act ("ADA"), against the officers who killed Richard Munroe, the City of Austin (the "City"), and Art Acevedo, the police chief at the time. The Munroes allege that their son was deprived of his constitutional rights by the officers' excessive use of force, that the police officers failed to accommodate his disability, and that the City should also be held liable for its failure to, among other things, properly train the officers.

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could

3

find for the non-movant, summary judgment will be granted." *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The Court views this evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 119, 122 (5th Cir. 1993). "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.*

### III. SECTION 1983: INDIVIDUAL OFFICERS

The Munroes bring claims against officers Murphy, Johnson, and Nelson for the violation of Richard Munroe's Fourth Amendment right to be free from excessive use of force pursuant to 42 U.S.C. § 1983. "An officer's use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Hatcher v. Bement*, 676 F. App'x 238, 242 (5th Cir. 2017) (citation and quotation marks omitted). The officers all assert qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome qualified immunity, a plaintiff must show that (1) the official violated a constitutional right, and (2) the constitutional right at issue was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds*, *Pearson v. Callahan*, 555 U.S. 223, 227 (2009). Courts are free to decide which prong of the qualified immunity analysis to take up first. *Pearson*, 555 U.S. at 236.

4

"Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The source of the clearly established law must be the Supreme Court, the Fifth Circuit, or another circuit. *In re Foust*, 310 F.3d 849, 861 n.13 (5th Cir. 2002) ("A consensus of authority in other circuits may 'clearly establish' a right even absent binding precedent by the Supreme Court or the Fifth Circuit."). When Section 1983 claims are brought against multiple officers, their entitlement to qualified immunity must be examined individually. *Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007). Accordingly, the Court takes up the claim against Murphy first.

*A. Murphy*

The Munroes contend that Murphy conducted two separate excessive uses of force: first, by tasing their son, and second, by shooting him. The officers counter that Murphy's decision to use the taser should not be considered because the shooting is the relevant incident, and Fifth Circuit case law makes clear that actions leading up to an alleged use of force are not relevant to determine whether the force used was excessive.[3] However, this characterization misconstrues the Munroes' allegation, which is that the taser deployment was itself an excessive use of force.[4] The Court therefore analyzes the two distinct uses of force separately.

---

[3] "Defendants anticipate that Plaintiffs will second-guess Murphy's decision to deploy the taser . . . . However, the Fifth Circuit has repeatedly held that an officer's actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry." (Officers' Mot. Summ. J., Dkt. 23, at 13).

[4] "Officer Murphy's firing of his taser against Brick was objectively unreasonable." (Pls.' Resp., Dkt. 29, at 15). The Munroes contend, in the alternative, that because the taser use and the gunshots occurred so close together temporally, they should be considered a single use of force. (*Id.* at 18 ("There is a fact dispute as to whether Officer Murphy fired his taser and firearm at the same time.")). They provide no cases to support undertaking such an analysis. The reasonableness inquiry is fact-dependent, and the alleged facts leading up to the use of the taser differ significantly from those immediately preceding the gunshots, as do the levels of harm the two separate methods of force can produce. Because the video from Johnson's dash cam shows clearly that the taser deployment and the first shot were separated by at least one second, and because the two methods of force are so different with respect to the consequences that may result from their use, *see, e.g.*, *Batiste v. Theriot*, 458 F. App'x 351, 354 (5th Cir. 2012) ("[W]e find no support, and Plaintiffs offer none, for the inference that the use of a taser is comparable to discharging a firearm."), the Court analyzes each use of force separately. Additionally, the officers proffer different justifications for the reasonableness of each use of force: Murphy's justification for the use of his taser was to "allow the officers to gain control of Munroe's gun," (the officers

5

1. Taser

The Munroes contend that Murphy acted objectively unreasonably when he tased Munroe. To establish a Fourth Amendment excessive force claim, a plaintiff must show that "she suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004) (citation omitted). "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). Reasonableness is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. It "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

The Fifth Circuit has clarified that the "excessive force inquiry is confined to whether the [officer] was in danger *at the moment of the threat* that resulted in" the use of force. *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 493 (5th Cir. 2001); *see also Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) ("[A]ny of the officers' actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry in this Circuit."); *Rockwell v. Brown*, 664 F.3d 985, 993 (5th Cir. 2011) ("We need not look at any other moment in time.").

---

do not contend that Munroe was holding his gun at the time Murphy used his taser), (Officers' Mot. Summ. J., Dkt. 23, at 12); the justification for the shooting is that Munroe allegedly brought his gun up towards Murphy. (*Id.* at 13).

Assuming, without deciding, that deploying his taser was an excessive use of force, Murphy is entitled to qualified immunity because doing so did not violate clearly established law. At the time that Murphy deployed his taser, Murphy had instructed Munroe to "put the gun down." (Murphy Dash Cam Video, Dkt. 23-5, at 4:13:20). Munroe put the gun in his lap, but the parties dispute whether that action complied with the order to put his gun down. Murphy believed that Munroe had not complied with his order because the gun was still in Munroe's lap and therefore "in his possession." (Murphy Dep., Dkt. 23-9, at 69:16–22). The Munroes contend that he was complying with the order because he had put the gun down. (Pls.' Resp., Dkt. 29, at 17). Whether or not Munroe's action technically complied with Murphy's order, the parties agree that the gun was in Munroe's lap at the time Murphy tased him. Murphy did so in an attempt to "achieve . . . neuromuscular incapacitation," after he "saw a very—what I presumed to be a very small window to take action, so I went forward and took that action." (Murphy Dep., Dkt. 23-9, at 71:25, 72:25–73:2).

The lack of clearly established law on this point at the time is illustrated most clearly by *Carroll v. Ellington*, where a deputy sheriff, "[u]nsatisfied with [the suspect's] decision to sit in a chair rather than comply with [the deputy's] order to get down on the floor," used his taser on a person suspected of trespass and vandalism who was sitting in a chair. 800 F.3d 154, 163 (5th Cir. 2015). The court declined to reach "the close constitutional question" of whether a reasonable jury could find that use of force to be excessive. *Id.* 174. That case, decided the month after this incident took place, demonstrates that Murphy was not on notice that his taser use was unconstitutional in the manner required to overcome the "clearly established" prong of qualified immunity. The person who was tased in *Carroll* was suspected of a crime, but not a particularly serious one. He also did not have a gun. The court found it to be a close question whether that use of force was unconstitutional. Here, Munroe was not suspected of a crime, but he did have a gun within reach at the time Murphy

7

tased him. He had blood on his arm, (Johnson Dep., Dkt. 23-8, at 19:8–19), the source of which was unknown to the officers. The officers also did not know whether or not anyone else was in the house at the time. Murphy's attempt to use less than lethal force to defuse the situation did not violate clearly established law; he is therefore entitled to qualified immunity with respect to the use of his taser.

### 2. Gun

Less than two seconds after he deployed his taser, Murphy began firing his gun at Munroe.[5] If Murphy's version of events were credited, Murphy's decision to begin shooting Munroe was objectively reasonable. Murphy contends he shot his gun in response to Munroe grabbing the gun from his lap and bringing it up towards Murphy. (Murphy Dep., Dkt. 23-9, at 75:23–25). If that was the case, Murphy "reasonably believed that the suspect posed a threat of serious harm to the officer or others." *Harris*, 745 F.3d at 772 (citation and brackets omitted). However, the Munroes have pointed to evidence that, if credited, would shed doubt on this account.

#### a. Constitutional Violation

The Munroes first note that punctures consistent with a taser wound were found on Richard Munroe's back, which Murphy cannot account for because he maintains that Munroe was facing him when Murphy tased Munroe. Murphy testified that he did not tase Munroe in the back. (Murphy Dep., Dkt. 23-9, at 81:5). He also testified that Munroe was not tased more than once, and he could not provide an explanation for why the only evidence of a taser mark on Munroe's body was on his back. (*Id.* at 81:6–11). Dr. Kendall Crowns, the Travis County deputy assistant medical examiner who prepared Munroe's autopsy, testified that two puncture wounds on Munroe's lower back were consistent with a taser probe. (Crowns Dep., Dkt. 29-17, at 89:15–90:6; *see also* Medical

---

[5] Although Johnson's dash cam video is grainy, it does provide audio that makes clear the timing of both the taser deployment and the initial gunshots. Between 4:14:03 and 4:14:06, Murphy moves from his cover up towards the house, near Munroe. The sound of the taser can be heard at 4:14:06; the first gunshot is fired at 4:14:07. The plaintiffs' expert estimates that the time between the taser deployment and the first gunshot is 1.16 seconds. (Report, Dkt. 29-16, at 14).

8

Examiner Report, Dkt. 29-14, at 21 ("There are two superficial puncture wounds of the lower left side of the back measuring 0.4 x 0.3 cm and 0.2 x 0.1 cm."); *id.* at 40–41 ("Additionally, two apparent puncture marks were observed to the decedent's left lower back. It was speculated by APD that the apparent puncture marks might be consistent with the taser prongs.")). Kelli Barge, a civilian who was seated in Johnson's car at the time, witnessed the incident. Her police statement reveals that after she heard the taser go off, she saw that Munroe "rolled over to his left and his body twisted a bit and [he] yelled out. Then I hear[d] shots being fired." (Barge Statement, Dkt. 29-19, at 4; Audio Recording of Barge Statement, Dkt. 29-15, at 22:34–23:57). Additionally, Nelson described Munroe's movement after Murphy deployed his taser as a "defensive jerk" and stated it looked like Munroe was "getting away from Murphy . . . it just kind of was like a . . . turn or a jerk, uh, like away from Officer Murphy." (Nelson SIU Interview, Dkt. 29-25, at 103).

There is therefore sufficient evidence to create a genuine dispute of fact as to whether Munroe was, as Murphy contends, moving his gun in Murphy's direction at the time that Murphy began shooting. This dispute is material because it would not have been reasonable for Murphy to shoot Munroe if he was falling over and not raising his gun at Murphy. *See Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 417 (5th Cir. 2009) (finding it unreasonable for a police officer to use deadly force against a person who does not pose a sufficient threat of harm to the officer or others); *Smith v. Smith*, 477 F. App'x 240, 241 (5th Cir. 2012) (finding that a material, genuine fact issue precluded summary judgment because "the reasonableness of that belief [that Smith was holding a gun, not a can] depends on how clearly Smith displayed his hands and how cooperative Smith was with the officers' instructions as Smith was exiting his home"); *Reyes v. Bridgwater*, 362 F. App'x 403, 407 (5th Cir. 2010) (finding constitutional violation when the person was shot when he "stood, in his own home, with a kitchen knife at this side, swaying slightly side to side, at a safe distance away from the officers when [an officer] opened fire"). To avoid "credit[ing] the evidence of the party seeking

9

summary judgment and fail[ing] properly to acknowledge key evidence offered by the party opposing that motion," *Tolan*, 134 S. Ct. at 1867–68, the Court must deny summary judgment as to this prong of the qualified immunity inquiry with respect to Murphy's firing his gun.

b. Clearly Established Law

Having found that a jury could reasonably conclude from this set of facts that Murphy's use of his gun was a constitutional violation, the Court considers whether this constitutional right was clearly established at the time of the incident. A right is clearly established when its contours are "sufficiently clear that every reasonable official would have understood that what [the officer] was doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation marks and brackets omitted). "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting Hope v. Pelzer, 536 U.S. 730, 740 (2002)). "Although a case directly on point is not necessary, there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015).

Drawing inferences in favor of the plaintiffs, the Court finds that Murphy's violation of Munroe's constitutional rights was clearly established at the time of the incident on July 5, 2015. *See, e.g.*, *Graves v. Zachary*, 277 F. App'x 344, 348 (5th Cir. 2008) ("Merely having a gun in one's hand does not mean *per se* that one is dangerous."). As in *Graves*, the question here is: did Munroe "appear to be in any condition to fire his weapon? [The defendant] says yes, but [the plaintiff] says no." *Id.*; *see also Robinson v. Nolte*, 77 F. App'x 413, 414 (9th Cir. 2003) (holding that the use of deadly force violated the suspect's Fourth Amendment rights where the suspect had a gun in his lap).

10

"It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a [person] who does not pose a sufficient threat of harm to the officer or others." *Lytle*, 560 F.3d at 417. Cases involving facts analogous to the events at issue in this case demonstrate that it was clearly established as of July 5, 2015, that it is a constitutional violation to shoot someone who has a gun nearby but is not holding it, and who is sitting down and falling over, away from an officer. *See Graves*, 277 F. App'x at 349 ("It does not take a specific case for an officer to know that he cannot shoot a compliant suspect"); *George v. Morris*, 736 F.3d 829, 832–33, 839 (9th Cir. 2013) (finding a jury could conclude there was a Fourth Amendment violation to shoot a suspect who was "holding a gun with the barrel pointing down" when there was a factual dispute as to whether the person pointed the gun directly at deputies); *Nance v. Sammis*, 586 F.3d 604, 610–11 (8th Cir. 2009) (finding a Fourth Amendment violation if evidence was accepted that suggested the toy gun was tucked in decedent's pants throughout the entire confrontation, that the officer only said to drop the gun and get on the ground, and that the decedent may have raised his hand while trying to get to the ground before the officer shot him twice without warning); *cf. Snyder v. Trepagnier*, 142 F.3d 791, 800 (5th Cir. 1998) (finding that, in the case of a fleeing suspect who was shot, when it was disputed whether he was holding a gun, "the jury needed to determine what sequence of events occurred, and, in particular, whether Snyder had a gun—or, if he did not actually have a gun, whether Trepagnier reasonably believed he did.").

The cases cited by the officers are distinguishable. *Manis* stands for the proposition that "an officer's use of deadly force [is] reasonable when a suspect moves out of the officer's line of sight such that the officer could reasonably believe the suspect was reaching for a weapon." *Manis v. Lawson*, 585 F.3d 839, 844 (5th Cir. 2009). This rule is well established. *Id.* (collecting cases). However, in that case it was undisputed that the suspect was, in fact, reaching under the seat of his

11

vehicle. *Id.* ("The Appellees do not dispute the *only* fact material to whether Zemlik was justified in using deadly force: that Manis reached under the seat of his vehicle and then moved as if he had obtained the object he sought."). Here, Murphy and Johnson say that Munroe was holding his gun and pointing it up in Murphy's direction, but that fact is disputed. The Munroes have produced evidence to suggest that Richard Munroe was not, in fact, pointing his gun, or even reaching for it. Therefore, *Manis* does not require a finding of qualified immunity on these facts.

Similarly, in *Colston v. Barnhart*, 130 F.3d 96 (5th Cir. 1997), "the suspect was moving toward a car containing a shotgun and was 'in a position to inflict serious harm on the officers with or without a weapon.'" *Hatcher*, 676 F. App'x at 244 (quoting *Colston*, 130 F.3d at 98, 99–100) (distinguishing *Colson* as falling under a line of cases that hold it not to be a violation of a clearly established Fourth Amendment right for "an officer to shoot a suspect while the suspect was on foot and when it was reasonable for the officer to perceive that the suspect posed a serious and immediate threat when the officer fired"). Considering the precedents available at the time of the incident, the constitutional violation alleged here was clearly established. The Court cannot grant summary judgment for Murphy on these facts.

*B. Johnson*

Johnson must also be denied qualified immunity based on the evidence recounted above. Johnson testified that after Murphy deployed his taser, Johnson began shooting because he saw Munroe reach down for the gun and point it at Murphy. (Johnson Dep., Dkt. 29-20, at 31:7–10).

Taking the evidence discussed above and drawing the inferences most favorably for the nonmovants, Johnson is not entitled to qualified immunity for the same reasons that Murphy is not. The evidence produced by the Munroes could permit a reasonable jury to conclude that Munroe was not, in fact, raising his gun at Murphy when Murphy began firing. If that is what happened, then Johnson could not have seen Munroe raise his gun at Murphy. More to the point, if that is what

happened, Johnson saw Munroe falling away from Murphy and not raising his gun. Under this version of events, a jury could conclude that Johnson violated Richard Munroe's Fourth Amendment right to be free from excessive force. He is therefore not entitled to qualified immunity; the Court denies him summary judgment.

*C. Nelson*

Nelson is entitled to qualified immunity. Nelson testified that, though he did not see Munroe point the gun in Murphy's direction, (Nelson Dep., Dkt. 23-7, at 118:13–23), "Mr. Munroe was still actively struggling and moving," and he heard two gunshots, causing him to fear that "Mr. Munroe had shot at Officer Murphy." (*Id.* at 158:4–8). Even when drawing every inference in favor of the Munroes, Nelson's reaction was objectively reasonable. Nelson knew that Munroe had a gun and was very close to Murphy. When he heard gunshots it meant that one of two things was happening: (1) Munroe was shooting at Murphy, or (2) Murphy was shooting at Munroe. Either way, his response was reasonable. It would of course be reasonable to employ deadly force if Munroe was firing at Nelson's fellow officer. And if Murphy was firing at Munroe, it was reasonable for Nelson to believe that Murphy had a legitimate reason for doing so, especially since Nelson was aware that Munroe had a gun within reach and had been behaving erratically. Given the information available to Nelson at the time, his action was objectively reasonable. Therefore, he is entitled to qualified immunity; the motion for summary judgment with respect to Nelson granted.[6]

---

[6] In the abstract, the result (the two officers who claim they fired because they saw a gun being pointed at one of them are denied qualified immunity; the officer who did not see the gun pointed is granted qualified immunity) may seem perverse. However, this conclusion is compelled by the evidence available at the summary judgment stage. The evidence produced by the Munroes would give a jury reasonable grounds for finding that Murphy and Johnson acted in a way that violated Munroe's clearly established constitutional rights. However, even if a jury were to find that Murphy and Johnson acted unreasonably because they could not have seen Munroe pointing his gun because he was actually falling away from Murphy at the time, Nelson's shooting in response to the sound of gunshots would still be objectively reasonable.

# IV. SECTION 1983: *MONELL* LIABILITY

*A. City*

    1. Inadequate Training

To bring a successful inadequate training claim against a municipality, a plaintiff must show "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). When a policy is not facially unconstitutional, a plaintiff must demonstrate that the city's adoption of the policy reached the level of deliberate indifference. *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009) (citing *Johnson v. Deep East Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004)). Deliberate indifference is a high bar. *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997) ("A showing of simple or even heightened negligence will not suffice."). A municipal policy can consist of either an official policy statement or a widespread practice of city officials or employees that is so common as to constitute a "custom that fairly represents municipal policy." *Deep East Tex.*, 379 F.3d at 309 (citing *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992)). If an officer did not violate a person's constitutional rights, that person cannot recover against a municipality for its policy, even if the policy "might have *authorized* the use of constitutionally excessive force." *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986).

"To prevail on a 'failure to train' theory a plaintiff must demonstrate: (1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010). To show deliberate indifference for a failure to train claim, a plaintiff may either (1) show that the municipality had notice of a pattern of similar violations; or (2) demonstrate that the need for more or different training was obvious based on a single incident. *Kitchen v. Dall. Cty., Tex.*, 759 F.3d 468,

484 (5th Cir. 2014), *abrogated on other grounds*, *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472–73 (2015). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 565 U.S. 51, 62 (2011). The Supreme Court has clarified that the second method, single-incident liability, is a limited exception, only to be applied in a case that may arise in which "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64. Deliberate indifference is "difficult, although not impossible to base on a single incident." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010). To prove municipal deliberate indifference in the absence of such an obvious defect in policy likely to cause a constitutional violation, a plaintiff must generally show that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

The Munroes have not put forth sufficient evidence to maintain their failure to train claim. As the City has shown, it provides its cadets and police officers training on the use of force, crisis intervention, and mental health. (Spangler Aff., Dkt. 25-2, at 3–4; Turner Aff., Dkt. 25-4, at 3–4). That training exceeds what the state requires, (*id.*), a factor that counsels against a failure to train finding. *Zarnow*, 614 F.3d at 171. The Munroes have identified no specific failure of the City's training policies. They have produced no evidence of a pattern of similar events occurring that would have put the City on notice of a need for further training; they have also not shown why different training procedures should have been obvious to the City. Because there is no genuine

15

dispute regarding whether the City's training was inadequate, the City's motion for summary judgment is granted with respect to this issue.

### 2. Inadequate Discipline, Supervision, Investigation

The Munroes' remaining municipal claims must meet the same high deliberate indifference burden to move forward. *Porter v. Epps*, 659 F.3d 440, 446–47 (5th Cir. 2011). A claim against a municipality based upon a failure to screen employees cannot merely allege a generalized lack of screening; it "must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Brown*, 520 U.S. at 397. The Court construes the allegation that the City had in place "inadequate warning systems to discipline and/or weed out potentially dangerous officers," (Compl., Dkt. 1, ¶ 36), as a failure to screen claim. The Munroes have put forth no evidence to suggest the presence of any indications that the officers were likely to inflict the injury suffered by Richard Munroe here. Therefore, this claim fails.

Similarly, to support a claim that a municipality failed to supervise or discipline a police officer accused of using excessive force, a plaintiff must show (1) a particular supervisor who failed to supervise the subordinate official; (2) a causal link between the failure to supervise and the violation of the plaintiff's constitutional rights; and (3) the failure to supervise was done so with deliberate indifference to the risk of a constitutional violation. *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). For the City to be held liable, "it at least must have been obvious that 'the highly predictable consequence' of not supervising its officers was that they 'would apply force in such a way that the Fourth Amendment rights of citizens were at risk.'" *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Brown v. Bryan Cty., Ok.*, 406 F.3d 450, 461 (5th Cir. 2000)) (brackets omitted). The Munroes' failure to provide any evidence regarding an indication that the Officers were improperly supervised therefore forecloses this claim, as well.

The same analysis applies to the claim regarding the City's alleged practice of failing to adequately investigate the uses of force by APD officers. This claim, which boils down to an allegation that the City "maintained an official policy that was permissive of excessive force," *Peterson*, 588 F.3d at 850, requires a plaintiff to show that there is a pattern of such uses of excessive force that went ignored. *Id.* The Munroes have not shown any evidence of such a pattern.

Finally, the Munroes have also produced no evidence to indicate a practice of employing excessive force disproportionately against mentally ill people.[7] This element of the claim, too, must fail. For these reasons, the City's motion for summary judgment is granted as to the Munroes' *Monell* claim.

*B. Supervisory Liability: Acevedo*

The City also brings a claim against APD Chief Art Acevedo for failing to supervise the Officers by failing to ensure that they received proper crisis intervention training. (Compl., Dkt 1, ¶ 38). Section 1983 does not permit *respondeat superior* liability, *Peterson*, 588 F.3d at 847. A supervisor can be held liable "only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Gates v. Tex. Dept of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008) (citation omitted).

The Munroes have not pleaded that Acevedo participated in the shooting, so their claim must rely on the implementation of an unconstitutional policy, which here requires that they show Acevedo (1) failed to supervise the Officers; (2) the failure to supervise caused a constitutional violation; and (3) the failure to supervise reaches the level of deliberate indifference. *Estate of Davis*, 406 F.3d at 381. Deliberate indifference of a supervisor requires that he "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also

---

[7] As the City notes in its brief, the allegation that the City employed excessive force disproportionately against minorities is irrelevant here, because Richard Munroe was a white male.

17

draw the inference." *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The City points to evidence that it provided 40 hours of crisis intervention training to each officer when they were cadets at APD Training Academy. (Turner Aff., Dkt. 25-4, ¶ 6). The City has attached the entirety of its lengthy crisis intervention training materials to its motion for summary judgment. (Training Materials, Dkts. 25-4–25-14). When the officers completed the training, it exceeded the state-mandated minimum of 16 hours. (*Id.* ¶ 5). Each of the Officers completed this training. (Spangler Aff., Dkt. 2, ¶ 9; Nelson Training Record; Dkt. 25-17, at 5; Murphy Training Record, Dkt. 25-17, at 11; Johnson Training Record, Dkt. 25-17, at 16). The Munroes do not mention anything about Acevedo personally in their response to the motion for summary judgment, nor do they identify any specific failures in the supervision of the Officers. They assert the generalized allegation that "there was a failure in coordination and communication" and that "[w]hen there is no shift sergeant on duty and a corporal is in charge and handling supervisory duties, he or she should not have more than one shift to supervise." (Pls.' Resp. City's Mot. Summ. J., Dkt. 31, at 10). The City has produced evidence that Corporal Hector Campos was only in charge of one shift, (Campos Dep., Dkt. 34-2, at 25:19–26:20). But even assuming that the Munroe's statements are true, they have not put forth sufficient evidence to create a genuine dispute as to whether any failure in supervision reached the level of deliberate indifference. The motion for summary judgment as to the claims against Acevedo is granted.

## V. ADA

Finally, the Munroes bring a claim pursuant to the ADA, contending that the City denied Richard Munroe a reasonable accommodation of his mental disability. (Compl., Dkt. 1, ¶¶ 41–43). The ADA claim is directly controlled by *Hainze v. Richards* and therefore must be dismissed. In *Hainze*, the Fifth Circuit held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with

18

mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000). Although in hindsight it appears that Munroe's BB gun probably was not a threat to the officers at the scene, because the gun was in appearance an exact replica of a real handgun, they could not have known that at the time. They cannot be said to have finished securing the scene before shooting Richard Munroe; rather, they did so in the process of attempting to secure the scene. *Hainze*, 207 F.3d at 801 ("To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and nearby civilians, would pose an unnecessary risk to innocents."). Indeed, the Munroes do not respond to the City's argument that *Hainze* forecloses their ADA claim in this case. The City has put forth sufficient evidence to shift the summary judgment burden to the Munroes by pointing to deposition testimony that the Officers "were in the process of securing the scene and assessing the situation when Munroe suddenly appeared with blood on his body and waving a gun in their direction." (City's Mot. Summ. J., Dkt. 25, at 19 (citing Murphy Dep., Dkt. 15, at 47; Johnson Dep., Dkt. 16, at 20–21)). The Munroes have not put forth any evidence to suggest that there is a genuine dispute of material fact regarding whether the Officers had completed securing the scene at the time of the shooting. Therefore, summary judgment must be granted in favor of the City with respect to the Munroes' ADA claim.

## VI. CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by Defendants Matthew Murphy, Stephen Johnson, and John Nelson, (Dkt. 23), is **GRANTED IN PART AND DENIED IN PART**. Summary Judgment is **DENIED** as to Defendants Murphy and Johnson. Summary Judgment is **GRANTED** as to Defendant Nelson.

The City of Austin and Art Acevedo's motion for summary judgment, (Dkt. 25), is **GRANTED**. Both claims against the City of Austin and Art Acevedo—the Section 1983 claim and the ADA claim—are **DISMISSED**. The Section 1983 claim against John Nelson is **DISMISSED**.

**SIGNED** on March 12, 2018.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE